# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4452-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

M.E.L.-G.,

      Defendant,

and

B.E.C., JR.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
R.S.C. and L.W.C., minors.

_____

      Submitted December 13, 2021 – Decided December 22, 2021

      Before Judges Fasciale and Sumners.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0108-20.

Joseph E. Krakora, Public Defender, attorney for appellant (Anastasia P. Winslow, Designated Counsel, on the brief).

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Sara M. Gregory, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Louise M. Cho, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant B.E.C., Jr. (the father) appeals from a July 22, 2020 order terminating his parental rights to R.S.C. (Rachelle), born in 2011, and L.W.C. (Liam), born in 2012.[1] The father, who did not physically attend the Family Guardianship (FG) trial,[2] argues that the Division of Child Protection and

---

[1] These are fictitious names. See R. 1:38-3(d)(13).

[2] The father participated in the trial telephonically as he was incarcerated in Arizona. The judge found his testimony was "honest and sincere" and that he was straightforward about the significance of his substance abuse addiction, incarceration and history of homelessness, periodic lack of communication with the Division, failure to comply with the Division's services, and failure to seek visitation with the children or make inquiry about the children's general welfare.

2                                                                    A-4452-19

Permanency (Division) failed to prove by clear and convincing evidence each prong of the statutory best interests test under N.J.S.A. 30:4C-15.1(a). We disagree with defendant's arguments and affirm.

I.

We begin our discussion with the legal framework regarding the termination of parental rights. Parents have a constitutionally protected right to the care, custody, and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). That right is not absolute. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 553 (2014). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a test for determining when parental rights must be terminated in a child's best interests. N.J.S.A. 30:4C-15.1(a) requires the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to

3

provide a safe and stable home for the child and the delay of permanent placement will add to the harm;[3]

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

The four prongs are not "discrete and separate," but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." Ibid. (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 139 (1993)).

II.

We now turn to the father's argument that the judge erred in finding the Division proved by clear and convincing evidence each of the four prongs under

---

[3] We are aware that on July 2, 2021, the Legislature enacted L. 2021 c. 154, deleting the last sentence of N.J.S.A. 30:4C-15.1(a)(2), which read "[s]uch harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child."

4                                                                                        A-4452-19

the best interests test. We conclude that there exists substantial credible evidence to find that the Division satisfied the first prong under N.J.S.A. 30:4C-15.1(a). We agree substantially with the decision rendered by the judge, and add these remarks.

A.

The first prong of the best interests test requires the Division demonstrate that the "child's safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1); see also K.H.O., 161 N.J. at 352 (applying the first prong). The Division must prove that the child's health and development were threatened and will continue to be affected by the parent-child relationship. K.H.O., 161 N.J. at 348. The concern is not only with actual harm to the child, but also the risk of harm. In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999). The focus is not on a single or isolated event, but rather on the effect "of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. However, the judge need not wait "until a child is actually irreparably impaired by parental inattention or neglect" to find child endangerment. D.M.H., 161 N.J. at 383. A parent's withdrawal of nurture and care for an extended time is a harm that endangers the health of a child. Id. at 379. When

5

children "languish in foster care" without a permanent home, their parents' failure to provide a permanent home may itself constitute harm. Id. at 383.

The judge focused on the instability the children experienced since the father last saw them in 2012 or 2013. The judge found that during the father's absence, the children experienced medical neglect, housing instability, and Rachelle's maternal grandmother's paramour sexually abused her. She expressed concern about the father's long-term absence and found he "did little to nothing to protect [his] children." The judge also found that "[h]e had not seen the children for years since both the children were under three years old the last time he saw them. This neglect included failure to even keep in touch with the Division, failure to even inquire about the children, [and] failure to ask about visiting them."

The judge noted that the father acknowledged "he hadn't seen the children in approximately [seven] years or even talked to them" and "he was difficult to contact." The judge found that the father

> made minimal attempts to reach out to the Division to follow-up on his children's status. He was offered visitation by letter sent to the addresses he claimed to reside at. But he simply didn't avail himself of these opportunities. He did not bother to read the complaint concerning his children, the complaint regarding the fact finding. Nor did he contact the [c]ourt to find out what the status of that case was.

6

The judge further noted that

> [w]hile his contact information and his phone number and address may have frequently changed[,] the Division's number was always accessible. In his testimony he claimed he didn't have it, but that's hard to accept when we do have information for the Division . . . as it was called then, certainly, has a phone number that is easy to find. His failure to make even minimal efforts to keep the children in a safe protected environment is clear. He simply wasn't available to the children. He failed to protect them and care for them.

The judge found the Division established by clear and convincing evidence that the father endangered the children's safety, health, and development. His failure to provide even minimal parenting to his children resulted in harm to them. The father did not provide paternal care or support for the children. Indeed, even though he was allowed supervised visitation, the father visited the children only sporadically and when they were very young. In early 2020, he admitted he had not seen Rachelle since 2013 and could not recall the last time he saw Liam.

The father was never able to maintain stable housing for himself, much less for his children. While residing in New Jersey and Arizona, he repeatedly moved from place-to-place living with relatives, girlfriends, out in the streets, or in hotels. As the record shows, his homelessness was due mainly to his

A-4452-19

substance use; thus, the Division could not assess whether the homes he resided in were appropriate. Further, his lack of stable housing was for prolonged periods.

## B.

The second prong of the best interests test requires the Division to present clear and convincing evidence that "[t]he parent is . . . unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). The inquiry for the judge is whether the parent has cured and overcome the initial harm that endangered the child, and the parent is able to continue the parental relationship without recurrent harm to the child. K.H.O., 161 N.J. at 348. The Division must show continued harm to the child because the parent is unable or unwilling to overcome or remove the harm. N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 483 (App. Div. 2012). The first and second prongs relate to one another and "evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." D.M.H., 161 N.J. at 379. "Parental unfitness may also be demonstrated if the parent has failed to provide a 'safe and stable home for the child' and a 'delay in permanent placement' will further harm the child." K.H.O., 161 N.J.

8

at 352 (quoting N.J.S.A. 30:4C-15.1(a)(2)).  "Keeping [a] child in limbo, hoping for some long term unification plan, would be a misapplication of the law."  N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001).

The judge found the Division established by clear and convincing evidence that the father is unwilling or unable to eliminate the harm posed to the child.  The judge found there was "no indication he'll be able to parent the children in the foreseeable future."  She based her finding on the father's history of substance abuse addiction, domestic violence issues, multiple incarcerations, mental health issues, and homelessness.  The judge noted his "children simply do not know him."  She noted the experts expressed concerns "that delay of permanency will cause the children harm."  The father "has no home and no ability to care for the children."

Although he acknowledged and was candid about his persistent substance abuse, the father declined and was inconsistent in attending treatment while under the supervision of the Division despite the services provided to help him overcome his substance abuse issue, which led to homelessness and multiple incarcerations throughout New Jersey and Arizona.  The father had no plan to have the children placed with him.  Although he maintained a period of sobriety in the past, his extensive history of relapses demonstrated his inability to remain

A-4452-19

sober. His periods of sobriety only lasted a few months, with the longest being about nine months. His unstable housing combined with drug use, mental health issues, and voluntary withdrawal from his children's lives support the findings.

C.

The third prong requires evidence that "[t]he [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007) (internal quotation marks omitted). However, "the [D]ivision shall not be required to provide reasonable efforts to reunify the child with a parent if a court of competent jurisdiction has determined that . . . [t]he rights of the parent to another of the parent's children have been involuntarily terminated." N.J.S.A. 30:4C-11.3(c).

The judge found the Division established by clear and convincing evidence that the Division made many attempts over the years to locate the father

by contacting his mother and probation officers, and reaching out to him through letters, phone calls, emails, and Facebook. The judge also found that he was incarcerated multiple times, experienced homelessness, and changed his phone number many times—making it difficult for the Division to locate him and implement services and visitation. The judge noted, "[i]t's difficult to conceive of what other services the Division could have offered [the father] through the years given their constant efforts to locate him and get [a] response from him, and his failure to get back to them or participate in and successfully finish most of the services."

"The diligence of [the Division's] efforts on behalf of a parent is not measured by their success." D.M.H., 161 N.J. at 393. The Division "must encourage, foster and maintain the bond between the parent and child as a basis for the reunification of the family." Id. at 390. Reasonable efforts to reunite the family will depend on the circumstances of removal. N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007). The efforts by the Division to reunite the family should include, at a minimum:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development, and health; and

(4) facilitating appropriate visitation.

[N.J.S.A. 30:4C-15.1(c).]

The father argues the Division did not make reasonable efforts to locate him, provide him with services, and facilitate visitation. He cites four cases in support of this assertion, but they do not support his position.

The father's reliance on N.J. Division of Child Protection & Permanency v. A.S.K., 457 N.J. Super. 304 (App. Div. 2017) is misplaced. In A.S.K., the Division failed to locate the defendant after filing a complaint for guardianship of the defendant's son. Id. at 311. The Division did not locate the defendant until eleven months after the filing. Ibid. The Division acknowledged that, in its search efforts for the defendant, there were some deviations from its normal procedure, but the defendant was ultimately located. N.J. Div. of Child Prot. & Permanency v. A.S.K, 236 N.J. 429, 430 (2019). The Supreme Court "perceive[d] no prejudice" in the delay of service "on a biological parent who is not currently in the picture for a child under the [Division's] supervision." Ibid. (internal quotation marks omitted). The Court determined that the Division's current "processes would be enhanced by conducting a new search for a parent

for each phase of litigation, regardless of the recency of the previous search, and implementing procedures that retain a party's past contact information, with effective dates, to promote the accuracy of such information." Ibid.

Here, defendant contends "for a significant span of the proceedings below and lasting a period of nearly seven years (from early 2013 through 2019), [the Division] made—in its own words—'minimal efforts to contact [defendant].'" Unlike in A.S.K., where the issue was the Division's failure to run a new search after it filed the guardianship complaint, the father was served but again chose to make himself unavailable. The record shows that he did not respond to multiple calls, emails, or letters from the Division and was aware the Division was involved with the children when he relocated to Arizona. The Division granted him supervised visitation while residing in New Jersey, but he often failed to show up. After he was served with the guardianship complaint, he did not stay in contact with the Division, obtain suitable housing, or develop a plan for how he would care for his children.

N.J. Division of Youth & Family Services v. R.G., 217 N.J. 527 (2014) is distinguishable as well. Six months after the child's birth, the defendant was arrested and sentenced to a five-year prison term. Id. at 536. The defendant remained incarcerated during the Division's attempts to reunify the family and

during the guardianship trial.  Id. at 536-37.  The Court concluded the Division failed to show the defendant's incarceration caused harm to the child because the defendant parented the child prior to his incarceration, remained a part of the child's life, and communicated with the child while incarcerated.  Id. at 559-62.

The Court further held that "incarceration alone—without particularized evidence of how a parent's incarceration affects each prong of the best-interests-of-the-child standard—is an insufficient basis for terminating parental rights." Id. at 556.  "[I]ncarceration is a relevant factor in resolving termination of parental rights cases," but "it is by no means settled or obvious that incarceration is so inimical to the parental relationship as to justify its termination as a matter of law."  Id. at 555 (quoting In re Adoption of Children by L.A.S., 134 N.J. at 137-38).  The Court found that the Division visited the parent once in prison, called him once, completed two psychological evaluations but did not complete a bonding evaluation, did not provide him with his daughter's letters, did not facilitate telephone calls with his children, and never compared the programs he participated in prison to the Division's programs.  Id. at 562-63.

Here, the Division's inability to provide the father services was not a result of its unreasonableness or his incarceration.  Unlike the defendant in R.G., the

father has never lived with his children and has never cared for or supported them. Other than the occasional interactions with the children during the few supervised visitations he chose to attend seven years before trial, he never made any effort to communicate with or contact his children, either during or between his periods of incarceration. Also, even when the father resided in New Jersey, he failed to arrange for visits or to show up for scheduled visits arranged by the Division.

When he relocated to Arizona and was aware the Division was still involved with his children, he failed to inform the Division of his move or inquire about his children's status. The father did not contact, communicate with, or write to the children during defendant's periods of incarceration over the years. Even though he believed he could not contact them due to a Final Restraining Order (FRO), the FRO and court orders did not prohibit contact. Further, the record does not show whether he knew anything about his children's lives, such as names of their doctors or the schools they attended. Instead, the credible evidence in the record supports the judge's finding that the children "simply do not know him."

In New Jersey and Arizona, the Division attempted to locate the father through police searches, litigation searches, Human Services Police, letters to

15

known addresses, Facebook, emails, and phone calls to relatives and his probation officers. When the Division could locate him, he was referred for services including psychological evaluations, substance abuse evaluations, anger management classes, domestic violence counseling, and supervised visitation. Aside from completing one series of anger management classes, he was non-compliant with services. Additionally, defendant admitted he did not make himself available to the Division and that he was homeless for prolonged periods.

The father contends the Division failed to investigate potential paternal relative placements, specifically his aunt and uncle in Little Egg Harbor and relatives in Ohio. The father does not argue the children should have been placed with another relative. The judge concluded that the Division considered alternatives to termination of parental rights. She noted the children's placement with the maternal uncle "did not work out" and other relatives did not offer a workable placement.

As part of its analysis of the third prong, the judge must consider alternatives to the termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3). The Division must "initiate a search for relatives . . . who may be willing and able to provide the care and support required by the child." N.J.S.A. 30:4C-

12.1(a). When the Division has identified a willing and able relative, it "shall complete an assessment of each interested relative's . . . ability to provide the care and support, including placement, required by the child." Ibid.

Generally, a child's placement in the care of a relative or friend who is willing and able to accept the child is preferred. In re E.M.B., 348 N.J. Super. 31, 34 (App. Div. 2002) (noting the Division's "policy to place children with relatives when possible"). However, N.J.S.A. 30:4C-12.1(b) grants the Division the authority to "rule out" relatives or friends whom the agency determines are unable or unwilling to assume care for the child or with respect to whom placement would not be in the child's best interest. See N.J. Div. of Youth and Fam. Servs. v. J.S., 433 N.J. Super. 69, 85 (App. Div. 2013) (upholding the Division's rule-out authority based on a person's unwillingness or inability to care for the child, as well the child's best interests). In those circumstances, the Division "shall not be required to re-evaluate the relative." N.J.S.A. 30:4C-12.1(b).

There is substantial evidence in the record to show the Division considered available alternatives to termination of parental rights. The Division investigated placement with relatives from the children's mother, M.E.L.-B., (Megan)'s and the father's families. The record is unclear on whether Megan's

relatives were ruled out due to no response or housing concerns. The father's mother was ruled out due to ongoing mental health concerns, ongoing substance abuse issues, and financial inability to provide care for the children. The children were initially placed with the maternal uncle, but then he requested the children be removed. The Division also investigated Megan's half-sister S.B. (Sonia).

Defendant argues that only two rule-out letters were provided in the record and that the Division failed to investigate his relatives in Little Egg Harbor and Ohio. His argument is misplaced. There is no suggestion in the record that these relatives were interested in caring for the children, let alone that they were able to provide a safe and stable placement. Under N.J.S.A. 30:4C-12.1(a), the Division is only obliged to assess "each interested relative's ability to provide the care and support." As to these relatives, there is no basis to conclude they were interested in being considered as placements; therefore, the Division had no obligation to investigate them further.

The judge found that Sonia credibly testified as to her desire to adopt the children. The judge determined that she understood the differences between Kinship Legal Guardianship (KLG) and adoption and, ultimately, she decided

18

to adopt because she loved the children, did not want to enable Megan, and wanted to ensure the children's safety from the father.

KLG serves as a potential alternative to the termination of parental rights. N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 259 (App. Div. 2019). KLG "was enacted because 'the Legislature recognized that an increasing number of children who cannot safely reside with their parents are in the care of a relative or a family friend who does not wish to adopt the child or children.'" Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 222-23 (2010)); N.J.S.A. 3B:12A-1(c). The relative caregiver must be informed about the pros and cons of KLG, as required under the Kinship Legal Guardianship Notification Act. Id. at 261. If a trial judge approves KLG as an alternative to termination, the birth parent retains the right to consent to his or her child's adoption, name change, can have visits with the child, and remains obligated to pay child support. Id. at 260 (citing N.J.S.A. 3B:12A-4(a)(2)-(5)). However, "when the permanency provided by adoption is available, kinship legal guardianship cannot be used as a defense to termination of parental rights." N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 513 (2004). Accordingly, a caregiver's consent regarding adoption needs to be informed, "unconditional, unambiguous, and unqualified." M.M., 459 N.J. Super. at 264.

A-4452-19

The father's contentions that Sonia "repeatedly testified her first choice was KLG," and that she "repeatedly . . . felt pressured by [Division] caseworkers to select adoption," misrepresents the record. At first, Sonia considered KLG because she wanted to give her "sister the opportunity to prove herself." However, she ultimately preferred adoption because she wanted to ensure the children's safety from the father. Unlike in M.M., she was fully committed to adoption and understood that, under KLG, the judge could order visitation for Megan and the father, and under adoption she would control visitation.

D.

The fourth prong of the best interests test requires a determination that the termination of parental rights "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The judge must ask whether "after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [his or] her natural parents than from the permanent disruption of [his or] her relationship with [his or] her foster parents." K.H.O, 161 N.J. at 355. This prong "cannot require a showing that no harm will befall the child as a result of the severing of biological ties." Ibid. "The overriding consideration under this prong remains the child's need for permanency and stability." L.J.D., 428 N.J. Super. at 491-92. "Ultimately, a child has a right to live in a stable,

nurturing environment and to have the psychological security that his most deeply formed attachments will not be shattered." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 453 (2012). "A child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004).

The judge found the Division established by clear and convincing evidence that terminating the father's parental rights would not do more harm than good. She relied upon experts Dr. Gerard Figurelli's and Dr. Elizabeth Smith's testimony regarding the children's need for permanency, how the children were suffering from lack of permanency, and that delaying "permanency would cause serious and enduring harm." The judge noted the experts opined "that termination of parental rights would not cause more harm than good, but will instead free these children from limbo. The limbo is itself causing them harm." The judge also found that the children expressed their desire to be with Sonia and that the children "clearly need permanency."

Figurelli's and Smith's testimony supports the conclusion that the fourth prong was satisfied, and that termination will not do more harm than good. Both experts opined the children were suffering from a lack of permanency, the

A-4452-19

children were on their way to irreparable harm, and that termination would free the children from limbo. Sonia's testimony established that termination is likely to result in the countervailing benefit of adoption, and a permanent and stable home.

The children had no bond with the father. He admitted that he had been absent from their lives for seven years and chose not to be involved in their lives. He could not recall the last time he saw Liam. Thus, although the law recognizes that some harm to a child inevitably results from the termination of a parental relationship, where a parent is estranged from the child, that harm cannot be considered significant, particularly when balanced against the certain good of a stable placement and the likelihood of adoption.

The father's arguments "that the children had spent little time in foster care, had not bonded with their foster parents, and [the Division] did not even engage an expert to opine on the nature and extent of the children's relationship with the foster parents at the time of trial" is misplaced. The Division's plan was adoption by Sonia rather than continued placement with the resource parents. The judge had sufficient evidence based on her testimony and the testimony from the experts to conclude that placement with and adoption by Sonia would greatly benefit the children. The father argues the Division did not

22

conduct a bonding evaluation with him. But he conceded that if a bonding evaluation was conducted between him and the children, it would have been "unnatural" because the children did not know him.

To the extent we have not addressed any other argument, we conclude that they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4452-19